***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes. The appealing party has shown good grounds to reconsider the evidence; therefore, the Full Commission REVERSES the decision of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At the time of the alleged injury giving rise to this claim, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between Plaintiff and Employer-Defendant.
3. Waste Management, Inc. (hereinafter "WMI") was self-insured at all times relevant to the claims herein and Gallagher-Bassett Services was the Third-Party Administrator.
4. Plaintiff's average weekly wage was $1,100.00, yielding a compensation rate of $588.00 per week.
5. A videotape of the job duties of a front-end loader at WMI's Gastonia location was stipulated into evidence at the hearing in this matter.
6. The depositions of Dr. Kathryn Caulfield and Mr. Alan Gorrod are a part of the evidentiary record in this case.
 ***********
Based upon the evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was thirty-seven years old at the time of the deputy commissioner hearing in this matter. Plaintiff completed the eleventh grade and can read and write. Defendant-employer hired plaintiff on October 12, 1989 and has employed him continuously since that date.
2. WMI operates a garbage disposal service wherein employees perform a variety of tasks and job positions which include that of "front-end loader" and "swing driver". A written job description of a front-end loader commercial driver was introduced into evidence as Plaintiff's Exhibit 1 during the deputy commissioner hearing. Front-end loaders are primarily responsible for operating garbage trucks along certain routes to pick up and dispose of waste that is deposited in bins outside of commercial establishments. The garbage trucks, until approximately 1994, had manual transmission and a variety of levers which the front-end loaders operated in order to move the arms on the truck to load the bins and empty the waste. Since 1995, most of the garbage trucks at WMI in Gastonia are automatic and equipped with controls designed for easier use. Front-end loaders operate the garbage trucks and the controls within, empty the refuse from the compactor at the back of the truck by releasing the chain and turnbuckle to open the compactor, and frequently dispose of the remaining garbage in each truck by hand. While operating the trucks along the commercial routes each day, front-end loaders spend most of their time driving the trucks, as opposed to operating the levers.
3. In late 1993 or early 1994, plaintiff was transferred from his job as a front-end loader commercial driver to the swing driver position. Swing drivers have numerous responsibilities besides driving front-end loaders including assisting supervisors with establishing or re-doing routes; "navigating" or riding along with new, inexperienced truck drivers, scheduling routes for truck drivers, and occasionally filling in for truck drivers if they are sick or on vacation. Despite these additional job duties, plaintiff still spent a majority of his time as a swing driver since 1994 driving front-end loaders just as he did prior to his transfer.
4. The videotape introduced into evidence at the deputy commissioner hearing depicted two different employees driving two types of trucks, an automatic and manual drive truck. The videotape illustrated that to manipulate the front forks that picked up the garbage containers, the drivers would use a joystick with their right hand.
5. Plaintiff's front-end driver position required him to manipulate the forks using either levers or joysticks and exclusively using joysticks over the last three or four years. Plaintiff performed the dumping mechanism of his job between seventy-five (75) and two hundred twenty-five (225) times per day depending upon driving distances between various stops on his route. Plaintiff was required to climb in and out of the trucks by pulling himself up with his right arm approximately 15-40 times per day to open corrals to enable him to reach the dumpsters. When plaintiff was using the joy sticks at a particular dumpster, he moved the joy sticks for three to four minutes at a time, back and forth and side to side, to dump the garbage out of the dumpster.
6. Plaintiff worked as a swing driver an average of approximately five days per week and occasionally six days per week. Plaintiff's average work week was forty-eight to fifty-eight hours per week; however, plaintiff sometimes worked up to eighty hours per week.
7. In 1997, plaintiff began feeling tingling, numbness, and pain in his right wrist. These same symptoms advanced to plaintiff's elbow after approximately three to four months.
8. Plaintiff presented to Dr. Benson Timmons at Southeastern Hand Center on May 26, 1998. Plaintiff was diagnosed with cubital tunnel syndrome and ulnar nerve entrapment. Plaintiff's medical records from this date reflect that plaintiff informed Dr. Timmons during his first visit that his right wrist and elbow pain bothered him the most when he was working on his truck.
9. On October 8, 1998, plaintiff underwent a right carpal tunnel release and release of the ulnar nerve at Guyon's canal. Plaintiff missed approximately one week of work and then rode in a truck without driving for approximately six to eight weeks. Plaintiff continued treating with Dr. Timmons until December 1, 1998.
10. Plaintiff's wrist pain recommenced approximately six to eight months following his first surgery, and he continued to experience elbow pain as well.
11. Plaintiff returned to Dr. Timmons on September 19, 2000, complaining of continued pain in his elbow and his right wrist to his thumb. Dr. Timmons referred plaintiff to his associate, Dr. Kathryn Caulfield, an orthopedic surgeon with a specialty in hand surgery.
12. Dr. Caulfield initially treated plaintiff on September 26, 2000. Dr. Caulfield indicated in her notes from this visit that plaintiff suffered a right lateral epicondyle abrasion when he was thirteen years old and broke his wrist when he was seventeen years old. Dr. Caulfield further noted that plaintiff complained that his wrist pain was "especially bothersome when he has to do a lot of pushing and changing gears because he operates the joystick with his right hand on his truck." Dr. Caulfield diagnosed plaintiff with a scapholunate ligament tear, right dorsal wrist syndrome, and persistent symptoms of carpal tunnel syndrome.
13. On October 19, 2000, plaintiff underwent surgery by Dr. Caulfield who performed a right carpal tunnel release and right dorsal wrist exploration including an injection of the right lateral epicondyle. During the carpal tunnel release, Dr. Caulfield freed up more of the scar tissue that had formed and took more of the transverse carpal ligament out of plaintiff's hand. During the surgery, Dr. Caulfield observed a one-third to one-half scapholunate ligament tear and some osteophytes on the scaphoid bone which she shaved down.
14. Following his surgery, Dr. Caulfield wrote plaintiff out of work until November 13, 2000 at which time she released him to light duty of no driving, but just riding in the truck.
15. On January 3, 2001, plaintiff returned to Dr. Caulfield with continued complaints of right elbow and wrist pain. Plaintiff informed Dr. Caulfield that he had returned to working up to fifteen (15) hours per day, although Dr. Caulfield had never released him to full duty. According to plaintiff's medical records and testimony, plaintiff resumed regular duties at WMI, continued to use hand tools, drove his own personal truck, assisted his wife in caring for his five (5) children, and worked in his yard, despite the fact that his treating physician had placed physical restrictions on him.
16. Dr. Caulfield recommended plaintiff undergo a nerve conduction study which was performed on February 24, 2001. Based on the results of this study, Dr. Caulfield felt plaintiff had irritation of his ulnar nerve at his elbow and recommended surgery.
17. On July 23, 2001, Dr. Caulfield performed a right anterior transposition of the ulnar nerve on plaintiff's right arm. Dr. Caulfield returned plaintiff to light duty on September 5, 2001.
18. Plaintiff returned to full duty with defendant-employer in fall 2001; however, plaintiff's wrist continued to be painful and he continued to feel a "pinch" above his right elbow and continued pain, numbness, and tingling up and down his right arm.
19. Dr. Caulfield released plaintiff at maximum medical improvement on January 4, 2002 and assigned a twelve percent (12%) disability rating to his wrist based on his ligament tear, five percent (5%) disability rating for his ulnar nerve neuropathy, and three percent (3%) rating for his carpal tunnel condition.
20. Plaintiff is still employed by WMI but has not physically worked since January 18, 2002, when he called in sick with the flu. Plaintiff testified at the hearing that he did not return to work because of increased pain in his right arm. Plaintiff presented to Dr. Caulfield on February 20, 2002, and underwent a right wrist fusion on February 25, 2002. Dr. Caulfield did not change plaintiff's disability ratings following this fourth surgery.
21. Dr. Caulfield wrote plaintiff out of work on February 4, 2002 and stated his disability would continue for approximately twelve weeks following his surgery on February 25, 2002. No evidence has been presented as to plaintiff's disability following February 25, 2002.
22. Based on a review of the videotape and written job description, Dr. Caulfield opined that plaintiff's job as a swing driver could or might have caused plaintiff's conditions of carpal tunnel syndrome, ulnar nerve entrapment, and aggravation of his previous scapholunate ligament tear.
23. Dr. Caulfield opined that plaintiff's highly repetitive job was stressful to his hand and exposed him to a greater risk of contracting carpal tunnel syndrome, ulnar nerve entrapment, and aggravation of scapholunate ligament tear than the general public not so employed.
24. Dr. Caulfield opined that it was most likely that plaintiff's job aggravated his pre-existing wrist condition and ruled out other causes for plaintiff's ulnar nerve and median nerve entrapment including lack of history of thyroid problems nor family or personal history of diabetes. Dr. Caulfield also testified that the same physical activities can cause the unrelated conditions of ulnar nerve compression and carpal tunnel syndrome.
25. Alan C. Gorrod is the president and owner of a company that specializes in analyzing, assessing, and performing ergonomic studies of various occupations and jobs. Mr. Gorrod performed an ergonomic valuation and assessment of the front-end loader position at WMI and submitted a written report regarding the same on May 10, 2002. Based upon his review of the videotape stipulated into evidence in this matter, a written job description of the front-end loader, plaintiff's medical records, and Mr. Gorrod's knowledge and experience in the field of ergonomics, Mr. Gorrod determined that the overall risk factor to the right upper extremity was low. However, Mr. Gorrod admitted that the conclusions he reached based on the videotape were subjective in that his conclusions would depend on how a particular individual performed the particular job shown. Mr. Gorrod admitted he was unaware how long plaintiff has performed the jobs on the videotape, how long plaintiff performed each task shown on the videotape, how many different stops plaintiff made on his route, and how many days or hours per week plaintiff worked. Due to the self-admitted inherent unreliability of Mr. Gorrod's conclusions, the Full Commission gives little weight to Mr. Gorrod's ultimate opinions concerning the causal relationship between plaintiff's job and right arm conditions.
26. Plaintiff received short-term disability benefits while out of work from a plan funded completely by the employer.
 ***********
Based upon the foregoing Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's job with defendant-employer as a swing driver caused the occupational diseases in his right arm of carpal tunnel syndrome and ulnar nerve entrapment. N.C. Gen. Stat. §97-53(13).
2. Plaintiff's job with defendant-employer as a swing driver exposed him to a greater risk of contracting carpal tunnel syndrome, ulnar nerve entrapment, and scapholunate ligament tear. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff's job with defendant-employer as a swing driver aggravated the pre-existing scapholunate ligament tear in his right wrist causing the condition to become symptomatic and leading to eventual fusion of his right wrist. N.C. Gen. Stat. §97-53(13).
4. Plaintiff is entitled to receive temporary total disability benefits from October 19, 2000 through November 30, 2000; July 23, 2001 through September 10, 2001 and from February 4, 2002 through May 20, 2002. N.C. Gen. Stat. § 97-29. There is insufficient evidence at this time to determine plaintiff's entitlement to continuing temporary total disability benefits.
5. Plaintiff is entitled to receive permanent partial disability compensation for a twelve percent (12%) rating to his wrist based on his ligament tear, five percent (5%) rating for his ulnar nerve neuropathy, and three percent (3%) rating for his carpal tunnel condition, if plaintiff chooses election of benefits pursuant to N.C. Gen. Stat. § 97-31.
6. Plaintiff is entitled to receive ongoing medical treatment for his compensable right arm and wrist conditions so long as such treatment is necessary to effect a cure or give relief. N.C. Gen. Stat. § 97-25.
7. Defendants are entitled to a credit pursuant to N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission REVERSES the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendants shall pay plaintiff temporary total disability compensation at the rate of $588.00 per week for the periods of October 19, 2000 through November 30, 2000; July 23, 2001 through September 10, 2001; and February 4, 2002 through May 20, 2002 less the credit given to defendants for short term disability payments. This amount has accrued and shall be paid to plaintiff in a lump sum subject to an attorney's fee approved below.
2. This matter is remanded for an evidentiary hearing regarding plaintiff's entitlement to continuing temporary total disability benefits.
3. Defendants shall pay plaintiff permanent partial disability compensation at the rate of $588.00 per week for a twelve percent (12%) rating to his wrist based on his scapholunate ligament tear, five percent (5%) rating for his ulnar nerve neuropathy, and three percent (3%) rating for his carpal tunnel condition if plaintiff chooses election of benefits pursuant to N.C. Gen. Stat. § 97-31.
4. Defendants shall provide plaintiff with all medical treatment necessary to effect a cure or give relief for his compensable right arm and wrist conditions.
5. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff is hereby approved for plaintiff's counsel and shall be deducted from the lump sum due plaintiff and paid directly to plaintiff's counsel.
5. Defendants shall pay the costs due the Commission and an expert witness fee in the amount of $1,000.00 to Dr. Kathryn Caulfield, if not already paid.
This the ___ day of July, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________ CHRIS SCOTT COMMISSIONER